# Richmond

A. R. MacGregor, Administrator of the Estate of Harold Eugene Skidmore, Deceased v. Elwood Frank Bradshaw.

Elwood Frank Bradshaw v. T. Frank Fines, Administrator of the Estate of John Joseph Gilbert, Deceased.

June 16, 1952.

Record Nos. 3934, 3935.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Williams, Cocke & Tunstall* and *Lawson Worrell, Jr.,* for plaintiff in error, A. R. MacGregor, Administrator of the Estate of Harold Eugene Skidmore, Deceased.

*Rixey & Rixey* and *Spencer G. Gill, Jr.,* for defendant in error, Elwood Frank Bradshaw.

*Rixey & Rixey* and *Spencer G. Gill, Jr.,* for plaintiff in error, Elwood Frank Bradshaw.

*Williams, Cocke & Tunstall* and *Lawson Worrell, Jr.,* for defendant in error, T. Frank Fines, Administrator, &c.

EGGLESTON, J., delivered the opinion of the court.

On Monday, June 27, 1949, about four a. m., a trailer-truck driven by Elwood Frank Bradshaw northwardly along Highway No. 1, in Stafford county, collided with a Buick sedan driven southwardly and occupied by Harold Eugene Skidmore and John Joseph Gilbert. Skidmore and Gilbert were both killed and Bradshaw, the only survivor and eyewitness, was badly injured in the collision. There was no direct testimony as to which of the occupants of the Buick car was driving at the time of the collision, and one of the principal issues presented

to us is the sufficiency of the circumstantial evidence to warrant a finding that Skidmore was driving.

Bradshaw filed in the court below a notice of motion against the personal representatives of Skidmore and Gilbert to recover damages for his (Bradshaw's) serious injuries sustained in the collision. The notice alleged that at the time of the collision the car was being driven and operated by Skidmore and Gilbert and that the collision and resulting injuries to the plaintiff were proximately due to the negligent manner in which the Buick car was being operated.

In addition to a general denial, each personal representative filed a "Plea of Non-Agency," accompanied by an affidavit that "affiant's decedent" was not driving or operating the Buick car at the time of the collision. Code, § 8-115.

Upon the evidence adduced and after hearing the instructions of the court, the jury found a verdict of $15,000 in favor of Bradshaw against Skidmore's administrator, upon which the lower court entered judgment. It overruled the motion of Skidmore's administrator to set aside the verdict. It likewise overruled the motion of the plaintiff, Bradshaw, that upon the evidence adduced judgment should be rendered in his favor against both administrators.

Upon a single record we have granted writs of error to Skidmore's administrator and Bradshaw, respectively, to review the action of the court on these motions and on certain other incidents of the trial.

At the point where the collision occurred U. S. Highway No. 1 runs approximately north and south and is paved to a width of forty feet, with two northbound and two southbound lanes separated by a double white line. A secondary road, No. 627, intersects the eastern side of U. S. Highway No. 1 at an acute angle from the southeast. From the point of this intersection going northwardly, the direction which the truck was proceeding, the surface of the pavement is slightly upgrade.

At the time of the collision day had just broken and both vehicles had their lights on. The weather was clear, visibility good, and the road dry.

Immediately before the collision and for some time prior thereto the trailer-truck driven by the plaintiff, Bradshaw, with a gross weight of 40,000 pounds, was traveling north in its right-hand lane at a speed of about forty miles per hour.

According to Bradshaw, the only surviving eyewitness to the collision, as he was driving along in the manner indicated he noticed the Buick automobile coming southwardly along the road at a very rapid rate of speed. Suddenly the southbound car ran off the road on its right-hand side along the shoulder or ditch for about seventy feet, then cut to its left and ran or skidded at an undiminished speed diagonally across the road for a distance of approximately 150 feet into the eastern or northbound lane of the road along which the truck was then proceeding.

Bradshaw estimated the speed of the approaching car at eighty miles per hour. Sensing that a collision was imminent, he endeavored to cut his truck to the right but was unable to avoid the collision which occurred near the center of the easternmost or northbound traffic lane. The front of the automobile struck the left side of the trailer-truck near the cab. Both vehicles were demolished and came to a rest, heading northeast, against trees on the east side of the highway, to the right of the northbound traffic lane, and in the fork between the intersection of Highway No. 1 and secondary road No. 627. The truck caught fire.

Bradshaw, badly injured, was pinned in the cab of the truck, but was able to extricate himself from his burning vehicle. He observed that two occupants had been thrown from the car. The body of Skidmore, who had been killed instantly, was, as Bradshaw said, "lying on the left-hand side of the car, off a little distance." Gilbert, the other occupant, mortally injured, was "lying on the right-hand side" of the car.

The first person to reach the scene, who left without identifying himself, dragged Bradshaw away from the burning truck and placed him near the center of the secondary road. He also dragged Gilbert, who showed signs of life, away from the wreckage. He informed Bradshaw that Skidmore, who was then lying on the "left-hand side of the car," was dead.

The next person on the scene was W. H. Abel who lived in the vicinity. He found Skidmore's body "in front of the car" and Gilbert four or five feet south of the car.

State Trooper Powers, who arrived at the scene fifteen or twenty minutes after the collision, found the body of Skidmore lying in the center of the secondary road, just east of the eastern edge of U. S. Highway No. 1, and ahead of the automobile. It had been covered and left there to await the release of the

coroner. Gilbert was being loaded into an ambulance at the time Trooper Powers arrived on the scene.

Powers found both vehicles, heading north, against trees on the eastern edge of U. S. Highway No. 1, just south of the southern line of the secondary road. The automobile was ahead of or to the north of the truck. The left rear wheels of the trailer were almost off of the right-hand side of the road.

Trooper Powers found marks on the highway which confirmed Bradshaw's testimony that the automobile had run along the shoulder and into the ditch on the western side of the highway and then skidded across the paved portion of the highway at an angle of forty-five degrees, in a southeasterly direction, into the northern traffic lane of the truck. These marks, he said, indicated that the car was out of control.

The photographs offered as original exhibits in the court below corroborate the verbal testimony as to the complete demolition of the two vehicles.

The circumstances with respect to the operation of the Buick car are these: The automobile, a 1940 four-door sedan, belonged to Carl Gilbert of Detroit, Michigan. At the time of the accident his son, John Joseph Gilbert, twenty years of age, was a member of the United States Marine Corps, stationed at Camp Lejeune, North Carolina. Young Gilbert sought and obtained the permission of his father to drive the car from Detroit to Camp Lejeune, in order that the son might have the pleasure of using it for a short while in and around the camp. On Friday, June 24, about 4:30 p. m., young Gilbert and his friend, Skidmore, were granted liberty from the camp until six a. m. on Monday, the 27th. According to the captain of their company, who granted them leave, it was understood that they would go together to Detroit where Gilbert would get the car and that Skidmore would "help him drive it back" to camp.

The young men arrived at the Gilbert residence sometime on Saturday and left in the car together about two o'clock the next morning. No special instructions were given by the owner of the car as to how it should be driven, but it was his "understanding" that the young men "were going to share the duties in driving."

Gilbert senior estimated the distance from Detroit to Camp Lejeune at approximately 700 miles and thought that by "consistent driving" and without stops it could have been covered "very leisurely" in about sixteen hours. At the time of the

collision which, as has been said, occurred at about four o'clock on Monday morning, the young men were approximately 265 miles from the camp to which they were due to return at six a. m. on that day.

It is scarcely debatable that the evidence is sufficient to warrant a finding that the collision was proximately due to the negligence of the driver of the Buick car. We have the undisputed evidence that the occupants would be overdue at their destination, that their vehicle was traveling at a speed much in excess of the fifty miles per hour permitted by law (Code, § 46-212), that it ran off the road on its right-hand side and proceeded some seventy feet along the shoulder and ditch, then veered back to the pavement and skidded "sideways" in a manner indicating that it was out of control, for a distance of 150 feet, diagonally across the entire width of the pavement and into the easternmost northbound lane in which the truck was proceeding.

■ It was the duty of the operator of the car to drive on his right-hand side of the road (Code, § 46-220), and the unexplained fact that he was driving diagonally across the highway to the extreme left was evidence of negligence. *Interstate Veneer Co.* v. *Edwards,* 191 Va. 107, 112, 60 S. E. (2d) 4, 7.

■ We are also of opinion that the lower court correctly held that there was no evidence that the plaintiff, Bradshaw, was guilty of contributory negligence. He was keeping a proper lookout for traffic and saw the automobile proceeding in its proper lane some 350 feet away. When he saw that the oncoming car was veering diagonally across the highway into the traffic lane of the truck, as he said, he "tried to get out of the way, and "went off the right-hand side of the road, trying to miss the car," but was unable to avoid the collision. Thus, there is no evidence that the collision was proximately due to anything which the plaintiff did or failed to do.

■ The crucial question on this phase of the case is whether the evidence is sufficient to justify the jury's finding that Skidmore was driving the car at the time of the collision. We think that it is. It is apparent from the verdict that the jury adopted Bradshaw's testimony that immediately after the impact Skidmore's body was lying on the left-hand side of the car and that of Gilbert on the right. Both front doors of the Gilbert car were smashed open and the right-hand front door was torn off. The pictures show that the center of the front seat was blocked

off by wreckage which would justify the inference that neither occupant of the car could have been ejected through the door other than that next to which he was sitting. They also show the left rear door to be undamaged except for a broken glass. The right rear door appears to be jammed and only slightly open. There is no evidence that either rear door was open when the car came to a rest. These physical facts justify the inference that neither occupant was ejected through a rear door, which would have been the case if either had been occupying the rear seat.

Under these circumstances, and in view of the fact that Skidmore's body immediately after the collision was near the left front of the car, we are of opinion that the jury was warranted in finding that Skidmore was thrown from under the steering wheel through the left front door, and that Gilbert, who was lying to the right of the car, was thrown from the right front seat through the door on the latter side.

Error is assigned to the action of the trial court in not declaring a mistrial for the alleged improper argument before the jury of counsel for the plaintiff. The incident occurred in this manner: During the argument of the case before the jury counsel for the defendants, after explaining that under the court's instructions they could not return a verdict against both defendants' estates said: "Now it is true that this young man (the plaintiff) would like to be compensated. All of us would like to be compensated whenever we have been hurt and laid out of work. But how in the name of High Heaven under this evidence can you say which of these two young men's estates is going to pay that compensation. If you guess wrong you have hurt that estate. You have gone against the wrong man * * *."

In reply to this argument counsel for the plaintiff said to the jury: "I can say to you here that neither of these estates will be hurt one iota, one penny, if you render a verdict for the plaintiff."

Counsel for the defendants then moved for a mistrial because of this argument. Thereupon the court instructed the jury: "Gentlemen of the jury, it is your business to render a verdict in this case for either the plaintiff or the defendants, according to the evidence in the case, and you are not concerned with what effect it is going to have on either one of them. Now, you are not concerned at all about what effect it has on the parties. You are to do justice. 'Justice' means that you must render a verdict

for the plaintiff against one of the defendants or for the defendants. You are not concerned with what the result is going to be. * * * Disregard the argument of both counsel as to what effect the verdict has on either of the parties.''

■ Assuming, but not deciding, that the argument of counsel for the plaintiff, to which exception was taken, was improper, it was provoked and invited by the like argument of counsel for the defendants, and hence the defendants are in no position to complain. *Brann* v. *F. W. Woolworth Co.*, 181 Va. 213, 221, 24 S. E. (2d) 424, 427.

Moreover, the court promptly told the jury to disregard the argument of both counsel as to what effect the verdict would have upon any of the parties and render a verdict according to the evidence in the case.

Under these circumstances we are of opinion that the trial court committed no error in refusing to declare a mistrial.

On the whole we find no substance to the assignments of error filed on behalf of Skidmore's administrator.

In the petition for a writ of error filed on behalf of the plaintiff, Bradshaw, complaint is made that the court erred in overruling his motion to set aside the verdict in favor of Gilbert's administrator and enter a final judgment in favor of the plaintiff against the administrators of both decedents. In support of this contention it is argued that at the time of the collision Skidmore and Gilbert were engaged in a joint enterprise, or else Skidmore was driving as the servant or agent of Gilbert to whom the custody of the car had been entrusted, and that in either event the negligence of Skidmore, the driver, was imputable to Gilbert.

■ In 5 Am. Jur., Automobiles, § 501, pp. 786, 787, the test of a joint enterprise is thus stated: ''In order to constitute a joint enterprise so that the negligence of the driver of an automobile may be imputed to an occupant of the car, it is generally held that there must be a common purpose and a community of interest in the object of the enterprise and an equal right to direct and control the conduct of each other with respect thereto. In other words, the passenger, as well as the driver, must be entitled to a voice in the control and direction of the vehicle. There must be a community in the object and purpose of the undertaking and an equal right to direct and govern the movements and conduct of each other in respect thereof.''

The same principle is thus expressed in 60 C. J. S., Motor Vehicles, § 444, p. 1142, where it is said: ''* * * there must be

such a community of interest as to make each the agent of the other and the trip itself must be an integral part of the venture.''

For a full discussion of the subject see *Carroll* v. *Hutchinson,* 172 Va. 43, 53 *ff.,* 200 S. E. 644, 648 *ff.* In that case we said: ''The principles involved are analogous to those which apply to principal and agent; each is the agent of the other.'' (172 Va., at page 53, 200 S. E., at pages 648, 649.) See also, *Painter* v. *Lingon, post,* p. 840, 71 S. E. (2d) 355, decided to-day, overruling the application of the principle of joint enterprise as announced in *Washington, etc., Ry. Co.* v. *Zell,* 118 Va. 755, 88 S. E. 309.

In the present case while the occupants of the car had been on a joint visit to Gilbert's home in Detroit and at the time of the accident were bound on a joint return trip to the camp where they were stationed, there is no evidence that they had such a community of interest in the object of the trip as to constitute each the agent of the other in the operation of the car. There is no suggestion in the evidence that the car had been loaned to young Gilbert and Skidmore jointly. On the contrary, it had been loaned to young Gilbert for his pleasure and use at the camp. Thus young Gilbert was primarily interested in taking the car to the destination for which it was bound at the time of the collision.

Neither is there any evidence that in the operation of the car both young Gilbert and Skidmore had an equal voice in and right to control the operation of the vehicle. As was said in . *Carroll* v. *Hutchinson, supra,* ''* * * the fact that the parties take turn about in driving does not necessarily make the enterprise a joint one.'' 172 Va., at page 54, 200 S. E., at page 649. See also, *Outlaw* v. *Pearce,* 176 Va. 458, 471, 472, 11 S. E. (2d) 600, 606.

Indeed, the claim of joint enterprise or joint agency is entirely inconsistent with the plaintiff's other theory that Gilbert was the master or principal in the operation of the car and that Skidmore was the servant or employee. The relation of master and servant contemplates that one of the parties is the superior and the other the subordinate. It negatives the essential element of joint enterprise that both parties have an equal voice in and right to control the operation of the vehicle.

Nor do we think that the evidence shows as a matter of law that in the operation of the car Skidmore was the agent or

servant of young Gilbert so as to charge the latter with the negligence of Skidmore under the principle of *respondeat superior*.

The evidence as to the relationship of the two young men is quite brief. Gilbert senior, the owner of the car, testified that he understood from his conversation with his son that he and Skidmore "were to share the driving" from Detroit to Camp Lejeune.

According to Captain Saunders, the commanding officer who granted leave to the young men, they told him that Gilbert was to go to his home in Detroit to get the automobile and that Skidmore "was accompanying him to help him drive it back."

■ "The borrower of a motor vehicle is liable for the negligence of one who at the time of the injury is driving the vehicle as his agent or servant, but he cannot be held liable on the doctrine of *respondeat superior* for the negligence of one who is merely performing a friendly act for him in the absence of any legal relation in which he has the right to control the driver, * * *." 60 C. J. S., Motor Vehicles, § 449, pp. 1146, 1147.

■ Whether at the time of the occurrence the operator of the vehicle causing the injury stands in the relationship of servant or agent to the bailee or borrower is to be determined by the right of control and other tests generally applicable to the determination of the existence of the relation of master and servant. Generally the person who has the right to control the actions of the operator of the vehicle may as master be held liable for the operator's negligence. 60 C. J. S., Motor Vehicles, § 451-a, pp. 1148, 1149.

Here the possession and control of the car had been entrusted by the owner to young Gilbert, who for the purpose of the trip stood in the shoes of the owner of the vehicle and had the right to the control and direction of the operation of the car.

■ The testimony of Captain Saunders indicated that Skidmore undertook the trip for the benefit of young Gilbert and for the purpose of helping him drive the car back to camp. Under such circumstances we think the jury would have had the right to infer that Skidmore was thus driving the car as the agent or servant of young Gilbert.

On the other hand, the jury might have inferred from the evidence, and particularly that of Gilbert senior, that Skidmore went to Detroit as the guest of young Gilbert and undertook to share in the driving of the car as a friendly act and in return for

the courtesies shown him by his host. 60 C. J. S., Motor Vehicles, § 399(5), p. 1016; Anno., 10 A. L. R. (2d) p. 1364.

In short, we think the question of the relationship of these two young men toward each other at the time of this unfortunate accident, whether that of master and servant or host and guest, was for the jury under proper instructions.

With respect to this phase of the case there is no assignment of error that the issue of the relationship was wrongfully withheld from the jury, nor are we asked to remand the case for a determination of that issue. The assignment is that upon the evidence adduced the court should have found, as a matter of law, that in the operation of the car Skidmore was the servant or agent of young Gilbert, that the negligence of Skidmore was imputable to Gilbert, and that hence the plaintiff was entitled to a final judgment in his favor against Gilbert's as well as Skidmore's administrator.

Since, as we have said, under the evidence the relationship of the two young men was for the jury, it follows that the lower court committed no error in refusing to enter a final judgment for the plaintiff against Gilbert's administrator.

The judgment under review is affirmed with costs in favor of the defendant in error in each case.

*Affirmed.*